IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALECIA PERKINS-CARRILLO,

    Plaintiff,

     v.

SYSTEMAX, INC., d/b/a Global
Equipment Company, Inc.,

    Defendant.

CIVIL ACTION FILE

NO. 1:03-CV-2836-TWT

<u>OPINION AND ORDER</u>

This is an employment discrimination action.  It is before the Court on the

Motions for Summary Judgment of Defendant Systemax, Inc., d/b/a Global

Equipment Company, Inc. [Doc. 75] and Defendants Greg Garrison and Rodney Irby

[Doc. 76].  For the reasons set forth below, the Defendants' motions are GRANTED.

I.  <u>BACKGROUND</u>

Defendant Global Equipment Company, Inc.[1] ("Global") is engaged in the

business of selling material handling equipment to businesses throughout the world.

Plaintiff Alecia Perkins-Carrillo was employed as an Account Manager with Global,

at its Suwanee, Georgia location, from December 1996 until January 29, 2002.  The

---

[1]The Defendant notes that the Plaintiff incorrectly identified it as Systemax, Inc., d/b/a Global Equipment Company, Inc.

Plaintiff, who is fluent in Spanish, was hired by Defendant Rodney Irby, Global's former Sales Manager, to develop a customer base in Latin America.  Initially, however, the Plaintiff was permitted to solicit sales to domestic companies until she built up an account base in Latin America.  The Plaintiff successfully developed business in Latin America and became one of Global's highest paid account managers. In fact, the Plaintiff was the highest paid account manager from 1998 to 2000 and was among the highest paid in 2001.

As her Latin America account base grew, Irby steered the Plaintiff away from opening new domestic accounts, instructing her to focus her sales efforts on further expanding her Latin America business.  Additionally, Irby periodically removed certain domestic accounts from the Plaintiff in order to give her more time to concentrate in Latin America.  These account removals were in line with the practice of Defendant Greg Garrison, Global's former General Manager, who preferred to remove accounts from Global's top account managers when he believed that those managers would develop more business by servicing a limited account base. Frequently, when Global removed accounts, the account manager would experience a brief decrease in sales, and consequently, commissions.  However, sales would eventually rebound as the account manager focused efforts on his or her remaining accounts.  Accordingly, in early 2001, Global's seven top producing account

managers were called to a sales meeting where they were told their accounts would be reduced from 40 to 30.[2]  At that time, the Plaintiff was not required to reduce her account base, which stood in excess of 200 accounts.

In August 2001, Global laid off approximately half of its account managers as part of a reduction in force.  The Plaintiff was not among those laid off.  Shortly thereafter, Irby held a sales meeting and explained that many of the accounts serviced by those laid off would be redistributed among the remaining account managers.  According to the Plaintiff, Irby stated during that meeting that the top producing accounts would go to the top producing account managers.[3]  A few days after the meeting, the Plaintiff asked Irby and Jimmy Peters, her immediate supervisor, that she be assigned several domestic accounts affected by the layoff.  Irby refused, citing the need for her to focus on her Latin America accounts.  The Plaintiff expressed dissatisfaction with limiting her sales territory to Latin America, particularly because she believed it unfair that domestic account managers were selling to customers in her territory.

---

[2]Six of the seven account managers who suffered a decrease in accounts were male.

[3]Garrison testified, however, that the emphasis as to distribution would be "on the type of accounts that the associate already had."  (Garrison Dep. at 139.)

After Irby's refusal to grant her request, the Plaintiff approached Garrison and requested assignment of one large domestic account, once again stating her belief that accounts were being distributed unfairly.  The Plaintiff asserts that she complained that the distribution was unfair because male account managers were receiving more favorable treatment from Irby than were female account managers.[4]  Following the complaints, Garrison removed all domestic accounts from the Plaintiff and Patricia Hundsdorfer, Global's other bilingual account manager, and indicated that the accounts would be redistributed among the domestic account managers.  In return, the Plaintiff and Hundsdorfer would receive all Latin American accounts currently being serviced by the domestic sales force.  According to the Defendants, Garrison had been planning to remove the remaining domestic accounts from the Plaintiff and Hundsdorfer for some time and believed that the reduction in force provided an opportune time to implement the change.  The Plaintiff alleges that while she immediately lost her top domestic accounts and the concomitant commissions,[5]

---

[4]Garrison denies that the Plaintiff complained that accounts were being unfairly assigned based on gender but, rather, complained solely that domestic account managers, with no specific reference to gender, were selling in Latin America.

[5]The Plaintiff concedes, however, that she continued to process orders and receive commissions on domestic accounts beyond November 2001. (Perkins-Carrillo Dep. at 387-88.)

Hundsdorfer, who the Plaintiff asserts did not complain about discrimination, kept most of hers.

In October 2001, the Plaintiff decided to look for other employment. Despite the fact that she had signed a non-compete agreement, which she understood to prohibit her from working for a competitor, the Plaintiff sent her resume to and interviewed with a Global competitor, Indoff. In December 2001, the Plaintiff submitted an application for employment with Indoff, stating that she would retain 80% of her Global sales upon accepting employment with Indoff. Additionally, the Plaintiff provided Indoff with a list of Global customers. This violated Global's non-disclosure policy. On January 4, 2002, Indoff offered the Plaintiff a position and asked her to come to Indoff's headquarters on January 28, 2002. In connection with its offer of employment, Indoff sent the Plaintiff a "Letter of Understanding" that outlined the terms and conditions of her employment. The Plaintiff signed the letter and dated her acceptance as of January 25, 2002.

During her employment search, the Plaintiff contacted Rick Veal, an Indoff employee and former Global employee, to discuss employment at Indoff. Veal informed another Global account manager, Robert Holston, of his conversation with the Plaintiff. Holston notified his supervisor of the Plaintiff's plans to work for Indoff. The rumors that the Plaintiff was working for, or at least seeking employment

with, Indoff made their way to Global management.  According to Garrison, he elected not to terminate the Plaintiff at that time because he could not confirm that she was actually working for Indoff.  Later, the Plaintiff told Holston and another Global account manager that she would be visiting Indoff's headquarters on January 28, 2002.  Holston once again notified his supervisor of the Plaintiff's plans because he believed, based on her comment that she was going to "double dip" the companies, that the Plaintiff was planning to divert sales from Global to Indoff.  After learning that she planned to be there at the end of January, Garrison instructed Irby to call Indoff's headquarters to verify the Plaintiff's presence.  Irby placed the call, stating that the Plaintiff had a family emergency, and hung up once the Plaintiff answered. Because he believed that her presence at its headquarters confirmed that she was indeed working for Indoff, Garrison decided to discharge the Plaintiff.  Irby informed the Plaintiff of her termination when she returned to work on January 29, 2002.

The Plaintiff brought suit against Global as well as Garrison and Irby in their individual capacities.  As against Global, the Plaintiff alleges gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and asserts a claim for intentional infliction of emotional distress.  As against Garrison and Irby, the Plaintiff asserts a claim pursuant to 42 U.S.C. § 1985(3), alleging that they conspired to lie under oath in order to interfere

with this case.   Finally, she alleges that Global, Garrison, and Irby unlawfully monitored her telephone conversations, in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, and O.C.G.A. § 16-11-62 *et seq*.   The Defendants move for summary judgment on all of the Plaintiff's claims.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  DISCUSSION

A.    Title VII–Discrimination

Title VII makes it an "unlawful employment practice" for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In Count I of her Amended Complaint, the Plaintiff alleges that Global discriminated against her on the basis of her sex by taking away her domestic accounts and by terminating her employment, in violation of Title VII. (Am. Compl. ¶ 41.)

1.    Removal of Domestic Accounts

Global contends that the Plaintiff's claim alleging discriminatory removal of her accounts is time-barred because the Plaintiff failed to file a charge with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the allegedly discriminatory act. Title VII requires, as a prerequisite to maintaining an action in federal court, that the complainant file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice that constitutes the basis of the complaint. 42 U.S.C. § 2000e-5(e). The 180-day filing period begins to run from the date the employee learns of the adverse employment decision. Barnes v. Hillhaven Rehab. & Convalescent Ctr., 686 F. Supp. 311, 312 (N.D. Ga. 1988)

(citing Chardon v. Fernandez, 454 U.S. 6 (1981); Delaware State Coll. v. Ricks, 449 U.S. 250 (1980)).

The Plaintiff filed her charge of discrimination with the EEOC on July 25, 2002. (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. 13.) Therefore, she would be entitled to recover for discrete acts of discrimination that occurred on or after January 28, 2002. The Plaintiff claims that Global is liable for the sexually discriminatory removal of her domestic accounts. However, she concedes that these accounts were removed in November of 2001, outside the 180-day filing period. Nevertheless, she argues that her claim is not time-barred because the removal of her domestic accounts constitutes part of a continuing violation. The Court disagrees.

In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court discussed the circumstances under which application of the continuing violation doctrine is appropriate. In doing so, the Supreme Court held that the applicability of the continuing violation requirement for purposes of satisfying the timely-filing requirement depends on whether the claim is one alleging discrete discriminatory or retaliatory acts or one alleging a hostile work environment. Specifically, the Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113. Accordingly, even if there is a connection between acts, each discrete discriminatory

act triggers a separate 180-day period.  Id.; see also Labady v. Gemini Air Cargo, Inc., 350 F. Supp. 2d 1002, 1010 (S.D. Fla. 2004) ("The law is clearly established that discrete, time-barred discriminatory actions are not actionable, regardless of how they may relate to actions that were filed in a timely fashion.").  Discrete acts are those acts the occurrence of which are easily identifiable as a separate "unlawful employment practice," such as termination, failure to promote, denial of transfer, or refusal to hire. Id. at 114; Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1179 (11th Cir. 2005).  In cases involving discrete acts, relevant prior acts may be presented as background evidence in support of a timely claim; however, such acts cannot themselves form the basis for liability.  Morgan, 536 U.S. at 113; Ledbetter, 421 F.3d at 1179.

In contrast to claims involving allegations of identifiable discrete acts, hostile work environment claims evolve out of conduct that "occurs over a series of days or perhaps years" and are "based on the cumulative effect of individual acts."  Morgan, 536 U.S. at 115.  In those cases, because "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be

liable for all acts that are part of this single claim," provided that at least one act falls within the 180-day filing period.[6] Id. at 118.

The Plaintiff claims, among other things, that the removal of her domestic accounts amounts to a continuing violation because it affected her compensation through the last day of her employment on January 29, 2002. However, the fact that her compensation decreased as a result of having fewer accounts to manage does not represent a continuing violation. It is merely a continuing consequence of an alleged discrete discriminatory act. See Carter v. West Publ'g Co., 225 F.3d 1258, 1265 (11th Cir. 2000); see also Bradley v. Florida Dep't of Transp., No. 4:01CV342-RH, 2002 WL 32107945, at *8 (N.D. Fla. Nov. 11, 2002) ("But in this case there is no suggestion of pay discrimination, i.e., a structural disparity between plaintiff's pay and that of similarly situated employees, or even that the plaintiff's diminished pay rate is itself a product of ongoing retaliatory motives harbored by her employer. Instead, plaintiff points to a disparity between what she receives and what she would receive had she not been retaliated against-but this disparity is merely a lingering effect of the discrete and overt (and time-barred) retaliatory demotion."). Instead, the Court finds

---

[6]The Eleventh Circuit has characterized the Supreme Court's decision in Morgan as an effective rejection of the "continuing violation doctrine," which allowed instead for courts to view allegations of hostile work environment as "a single unlawful employment practice." Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002).

that the Plaintiff's claim involves alleged "discrete acts of discrimination" because the removal of her domestic accounts, even if occurring over a period of time and even if affecting her compensation in the future, were acts "discrete in time, easy to identify, and–if done with the requisite intent–independently actionable."  See Ledbetter, 421 F.3d at 1179 (claim arising out of alleged discriminatory pay occurring over a period of time, whether based on pay-setting decisions or the issuance of confirming paycheck, involved repeated discrete acts for purposes of timely-filing requirement).  Moreover, the Plaintiff concedes that she believed the removal of her domestic accounts to be discriminatory at the time it occurred and, in fact, complained that the distribution of domestic accounts was discriminatory as early as September and again in October of 2001.  (See Perkins-Carrillo Dep. at 189-90, 229-30.)  As the First Circuit explained, "[a] knowing plaintiff has an obligation to file promptly or lose his claim.  This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern."  Sabree v. United Broth. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 402 (1st Cir. 1990), quoted in Labady, 350 F. Supp. 2d at 1011.  Here, the removal of her accounts did not occur in a manner that prevented the Plaintiff from timely asserting her rights when the act or acts took place in or before November 2001.  Because each time Global removed or

refused to assign the Plaintiff domestic accounts constituted an alleged discrete discriminatory act, the Plaintiff was required to file a charge with the EEOC within 180 days after the accounts were taken away. The Plaintiff failed to file any such charge. Consequently, her present discrimination claim arising out of the removal of the accounts is time-barred and not actionable, warranting summary judgment for Global.

### 2.   Termination

The Plaintiff also alleges that Global discriminated against her on the basis of her sex when it terminated her on January 29, 2002. Title VII requires proof of intentional discrimination. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). A plaintiff may establish the requisite discriminatory intent through either direct or circumstantial evidence. See Underwood v. Perry County Comm'n, 431 F.3d 788, 793 (11th Cir. 2005). Because the Plaintiff has no direct evidence to establish that her termination was based on gender discrimination, she must use circumstantial evidence of discrimination to satisfy the burden-shifting test outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981). Under this framework, a plaintiff is first required to create an inference of discriminatory intent by establishing a *prima facie* case of sex discrimination. Underwood, 431 F.3d

at 794.  In order to establish a *prima facie* case, a plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified to continue performing the duties or the position in question; and (4) she was either replaced by a person outside her protected class or was treated less favorably than a similarly situated person outside of her protected class.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004); Maynard v. Board of Regents of the Div. of Univs. of the Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003).

Once a *prima facie* case is established, the defendant may negate the inference of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action.  McDonnell Douglas Corp., 411 U.S. at 802-04; Wilson, 376 F.3d at 1087.  The employer need not convince the Court that it was actually motivated by the proffered reason.  Wilson, 376 F.3d at 1087 (quoting Burdine, 450 U.S. at 254-55).  Rather, the defendant's "exceedingly light" burden is "one of production, not proof."  Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994); Perryman v. Johnson Prods. Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983).  If the defendant meets the burden of production, the presumption of discrimination is eliminated and the burden shifts back to the plaintiff to show that the reason proffered by the defendant is pretext for discrimination.  Burdine, 450 U.S. at 256; Wilson, 376

F.3d at 1087.  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." Wilson, 376 F.3d at 1088 (citing Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)).  Although the burden of production alternates between the plaintiff and the defendant, the ultimate burden of proving discriminatory intent remains at all times with the plaintiff.  Id. (quoting Burdine, 450 U.S. at 253, 256).

Global argues that the Plaintiff has failed to establish a *prima facie* case of discrimination because she has not alleged that she was replaced by a person outside of her protected class nor has she presented any evidence of a similarly situated male employee who was treated more favorably.  A plaintiff must identify a comparator that is similarly situated in "all relevant respects."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  The most important factors to consider are the nature of the offenses and the nature of the punishment imposed.  Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001); see also Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir. 1998) (quoting Holifield, 115 F.3d at 1562) ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.").  With regard to the similarity of offenses, "the comparator's misconduct must be nearly

identical to the plaintiff's in order to prevent courts from second-guessing employers'
reasonable decisions and confusing apples with oranges." Silvera, 244 F.3d at 1259
(internal quotations and citation omitted).

To establish her *prima facie* case, therefore, the Plaintiff would need to show
that a male employee engaged in the same or similar conduct of which she was
accused, namely working for a competitor, and was disciplined less severely. She
failed to present evidence of either fact. Instead, the only evidence relied on by the
Plaintiff is the fact that Patricia Hundsdorfer, a female bilingual account manager, was
treated more favorably than she was with regard to the assignment of accounts.
Although Ms. Hundsdorfer is quite clearly not a person outside of the Plaintiff's
protected class, the Plaintiff urges the Court to consider her as such based solely on
the fact that Irby stated that Hundsdorfer "thinks like a man" and considered her to be
"one of the boys." (See Perkins-Carrillo Decl. ¶ 13.) The Court declines to do so. In
support of her argument that Hundsdorfer should be deemed a comparator outside of
her protected class, the Plaintiff relies on the Third Circuit's decision in Goosby v.
Johnson & Johnson Medical, Inc., 228 F.3d 313 (3d Cir. 2000). That case is
inapposite. In Goosby, the defendant argued that the plaintiff, a black female, could
not establish gender discrimination because the only other woman in her division was
assigned to a more preferable position. Id. at 321. The Third Circuit emphasized that

those circumstances did not necessarily defeat a claim of gender discrimination, recognizing that "[w]ithin the atmosphere of the 'old boys' network' . . . it is certainly possible that some females may have been preferred because they were more 'like one of the boys' than [the plaintiff]." Id.  Although the court noted that some females may be considered more "like one of the boys," nothing in the court's discussion indicated that such a female could or should be considered a sufficient comparator for purposes of evaluating the treatment of a similarly situated employee outside the plaintiff's protected class.  Because she has not identified any similarly situated employee outside of her protected class who was disciplined less severely, the Plaintiff has failed to make out a *prima facie* case of gender discrimination under the McDonnell Douglas framework.  See, e.g., Camara v. Brinker Int'l, 161 Fed. Appx. 893, 896-97 (11th Cir. 2006) (summary judgment proper where plaintiff failed to establish *prima facie* case of discrimination absent evidence of similarly situated employee who was treated less severely); Maynard, 342 F.3d at 1290 (same); Smith v. Akstein, 408 F. Supp. 2d 1309, 1333 (N.D. Ga. 2005) (same).

Even assuming that the Plaintiff could establish a *prima facie* case, her claim of discriminatory discharge fails because she has not shown that the reason offered by Global for her termination was pretext.  As discussed above, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for the employee's termination.  Global asserts that the Plaintiff was discharged after Global received information indicating that she was working for a competitor.  The undisputed evidence shows that the Plaintiff signed a non-compete agreement when she began her employment with Global.  Pursuant to the non-compete agreement, the Plaintiff understood that she was not permitted to work for a competitor while still employed with Global or immediately after working for Global.  (See Perkins-Carrillo Dep., Vol. II, Ex. 4.)  Nevertheless, the Plaintiff concedes that she sought employment with Indoff, a competitor of Global, while still employed with Global.  (Def. Global's Statement of Material Facts ¶¶ 42-43; Pl.'s Response to Def. Global's Statement of Material Facts ¶¶ 42-43.)  In fact, in early January 2002, the National Marketing Director for Indoff contacted the Plaintiff and offered her a position of employment with Indoff.  (See Temple Aff. ¶ 8; Suntrup Aff. ¶ 6.)  In relation to the offer of employment, the Plaintiff also received a "Letter of Understanding" that outlined the terms and conditions of her employment with Indoff. The Plaintiff signed and dated the letter on January 25, 2002: four days before she was discharged by Global.  Given that the Plaintiff was foreclosed by the non-compete agreement from working for a competitor while also working for Global, Global has presented sufficient evidence to meet the "exceedingly light" burden of articulating a legitimate, nondiscriminatory reason for its decision to terminate the Plaintiff.

By offering this nondiscriminatory reason, Global eliminates the presumption of discrimination and shifts the burden back to the Plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision" but, rather, is pretext for discrimination. Burdine, 450 U.S. at 256. In order to demonstrate pretext, a plaintiff must show either "that a discriminatory reason more likely motivated the employer . . . or that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. A plaintiff must do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004). The failure to present significantly probative and concrete evidence of pretext justifies summary judgment for the defendant. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990); Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988).

As noted, Global contends that the decision to terminate the Plaintiff was made after hearing rumors that she was working for and diverting sales to a competitor. For instance, Global alleges that in early January of 2002, Rob Holston, a Global sales associate, told Garrison and Irby that the Plaintiff was attempting to work for Indoff. Later that month, Holston informed his immediate supervisor of a conversation he had

with the Plaintiff during which the Plaintiff stated that she was going to Indoff for training and was going to "double dip" the companies.  (Holston Dep. at 61-63 & Ex. 1; Logsdon Dep. at 66.)  Despite this information, Global asserts that the ultimate termination decision was not reached until Irby was able to verify the Plaintiff's presence at the Indoff headquarters on January 28, 2002, the date she told Holston she would be visiting Indoff.

The Plaintiff argues that Global's articulated reason for the termination decision is unworthy of credence, and thus pretextual, because there are material inconsistencies in the record.  Specifically, the Plaintiff points to inconsistencies regarding the following facts: (1) when Garrison and Irby first learned that the Plaintiff was working for Indoff;[7] (2) what Garrison and Irby did when they first learned that she was allegedly working for Indoff;[8] and (3) why the Plaintiff was actually terminated.  However, the Plaintiff does not dispute the fact that she was actually engaged in the misconduct suspected by Global.  For instance, she admits that

---

[7]The Plaintiff points to the fact that Garrison and Irby testified that in early January 2002, they learned from Holston that the Plaintiff was working for Indoff. In contrast, Holston testified that he learned in late December 2001 or early January 2002 that the Plaintiff was interviewing with Indoff.

[8]The Plaintiff alleges that Garrison and Irby's testimony regarding whether they requested that Herb Maldonado monitor the Plaintiff's telephone calls, after learning that she was allegedly working for Indoff, illustrates an inconsistency given that Maldonado denied being asked to monitor the calls.

she interviewed for employment with Indoff in November 2001, and that she informed

Holston that she would be visiting Indoff on January 28, 2002. She further admits that

she was indeed present at Indoff on January 28, 2002. Moreover, the Plaintiff did, in

fact, accept employment with Indoff.[9]

Regardless of whether the Plaintiff was actually working for Indoff at the time

she was terminated by Global, an "employer may fire an employee for a good reason,

a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its

action is not for a discriminatory reason." Chapman v. AI Transport, 229 F.3d 1012,

1030  (11th Cir. 2000) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d

1181, 1187 (11th Cir. 1984)); see also Damon v. Fleming Supermarkets of Florida,

Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically

held that a defendant may terminate an employee for a good or bad reason without

violating federal law.  We are not in the business of adjudging whether employment

---

[9]Global contends that the Plaintiff was already employed with Indoff prior to
her termination based on the Indoff "Letter of Understanding" signed by the Plaintiff
on January 25, 2002. According to the Plaintiff, however, she did not actually accept
employment with Indoff until after she was terminated by Global. This factual dispute
alone does not prevent summary judgment for Global.  It is irrelevant whether the
Plaintiff was actually employed by Indoff at the time of her termination, provided that
Global had a good faith belief that she was working for a competitor at the time of her
termination.  See Hendricks v. Baptist Health Servs., 278 F. Supp. 2d 1276, 1288
(M.D. Ala. 2003) ("An employer's good faith, but incorrect, belief that an employee
violated a work rule can constitute a non-discriminatory reason for that employee's
suspension or termination.").

decisions are prudent or fair."). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Silvera, 244 F.3d at 1261 (quoting Wolf v. Buss (America) Inc., 77 F.3d 914, 919 (7th Cir. 1996)). Accordingly, this Court will not second-guess the business judgment of an employer. The inquiry is limited to whether the employer offered an honest explanation for terminating the employee, regardless of whether the decision might have been mistaken. Chapman, 229 F.3d at 1030; Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

Rather than dispute the facts relied upon by Global, the Plaintiff argues that Garrison and Irby's belief that the Plaintiff was working for a competitor was not in good faith because they failed to confirm independently that she was actually working for Indoff prior to terminating her employment.[10] The Plaintiff quarrels about the amount of evidence Global possessed at the time of her termination to establish its good faith belief that she was working for Indoff, all the while admitting that she was seeking employment with Indoff. In fact, Angela Suntrup, the National Marketing Manager for Indoff and in charge of recruiting and hiring, testified that she extended

---

[10]In support of this argument, the Plaintiff relies in part on criminal cases that address the reasonableness of a police investigation for the purposes of establishing probable cause. See Kingsland v. City of Miami, 382 F.3d 1220, 1229 (11th Cir. 2004); Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996). These cases clearly have no bearing on the pretext analysis in an employment discrimination case.

an offer of employment to the Plaintiff in the beginning of January 2002, which the Plaintiff accepted. (Suntrup Aff. ¶ 6.) As such, the Court is not persuaded by the Plaintiff's arguments regarding the alleged inconsistencies, none of which appear to be material, particularly in light of the fact that Global's suspicions were founded. Moreover, with regard to Global's alleged lack of good faith, the Plaintiff's contentions are based on nothing more than her subjective belief as to the degree of proof Global should have had before terminating her. In essence, the Plaintiff does nothing more than criticize the business judgment of Global, which is insufficient to raise an issue of pretext. Although Global probably could have taken more extensive measures to verify with absolute certainty that the Plaintiff was working for Indoff, "in carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law." Equal Employment Opportunity Comm'n v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000). Here, the evidence establishes that even if mistaken about whether the Plaintiff was actually working for Indoff or merely interviewing, Global had a good faith belief that the Plaintiff had violated the non-compete agreement by working for a competitor. See Damon, 196 F.3d at 1363 n.3 ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). The

Plaintiff fails to raise a triable issue of fact that Global's reason was pretext for discrimination. Thus, summary judgment for Global on the Plaintiff's discriminatory discharge claim is warranted.

      B.     <u>Title VII–Retaliation</u>

Title VII also prohibits an employer from taking an adverse employment action against an employee in retaliation for opposition to a discriminatory employment practice or for participation in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). Similar to her claims for sex discrimination, in Count II of her Amended Complaint, the Plaintiff alleges that Global unlawfully retaliated against her following her complaints of sex discrimination by taking away her domestic accounts and by terminating her employment. (Am. Compl. ¶ 46.)

      1.     <u>Removal of Domestic Accounts</u>

Retaliation claims are no different than discrimination claims with regard to the requirement that a charge be filed with the EEOC within 180 days after the alleged retaliatory act before any action may be filed in a federal court. <u>See</u> <u>Gregory v. Georgia Dep't of Human Res.</u>, 355 F.3d 1277, 1279 (11th Cir. 2004). As discussed above, the removal of the Plaintiff's domestic accounts, whether for allegedly discriminatory or retaliatory reasons or both, constitutes a discrete act. The Plaintiff failed to file a charge with the EEOC within 180 days after the accounts were

removed. Therefore, as with the discrimination claim, the Plaintiff's retaliation claim based on the removal of her domestic accounts is time-barred. Summary judgment for Global is proper.

### 2. Termination

A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1233 (11th Cir. 2006). A plaintiff is not required to prove the existence of the underlying discrimination claim. Rather, in order to show that she engaged in a protected activity, the employee must show only that she had a reasonable good faith belief that the alleged discrimination existed. Taylor v. Runyon, 175 F.3d 861, 869 (11th Cir. 1999); Holifield, 115 F.3d at 1566. Once the *prima facie* case of retaliation is established, the McDonnell Douglas framework applicable to Title VII discrimination cases governs, requiring the plaintiff to demonstrate that any legitimate, nondiscriminatory reason articulated by the employer is simply pretext for retaliation. See Holifield, 115 F.3d at 1566.

Global argues that the Plaintiff cannot establish the first and third elements of a *prima facie* case. First, Global contends that the Plaintiff did not engage in protected

activity.  Under Title VII, protected activity does not encompass complaints about

employment practices not including allegations of discrimination as defined by Title

VII.[11]  Coutu v. Martin County Bd. of Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995).

Instead, a plaintiff engages in protected activity only by opposing an unlawful

employment practice ("opposition clause") or by participating in an investigation,

proceeding, or hearing under Title VII ("participation clause").  42 U.S.C. § 2000e-

3(a).  Under the opposition clause, Title VII protection "is not limited to individuals

who have filed formal complaints, but extends as well to those . . . who informally

voice complaints to their superiors."  Rollins v. Florida Dep't of Law Enforcement,

868 F.2d 397, 400 (11th Cir. 1989).  In order for an informal complaint to qualify as

statutorily protected activity, the plaintiff must show that she put her employer on

notice that she was protesting an illegal employment practice:

> At a minimum, an employee must communicate to her employer her
> belief that discrimination was occurring.  It is not enough to simply
> complain in a . . . neutral way about an employer's practices, and then
> expect the employer to speculate as to whether such complaints may be

---

[11]Title VII defines "unlawful employment practices" as: "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

motivated by an employee's subjective and undisclosed belief that the employer was engaged in . . . discrimination.

Wehunt v. R.W. Page Corp., 352 F. Supp. 2d 1342, 1358 (M.D. Ga. 2004).

According to the Plaintiff, she engaged in statutorily protected activity when she complained to Global management that male sales associates were receiving more favorable treatment regarding account assignments than were the female sales associates.  Global concedes that the Plaintiff complained about the distribution of accounts, but it contends that she simply claimed that she was being treated unfairly and did not expressly allege that the distribution was discriminatory.  (See Garrison Dep. at 147-48.)   The Plaintiff testified, however, that she complained to her immediate supervisor, Jimmy Peters, that Irby treated Global's male employees more favorably than it treated the women.  (See id. at 189, 209-10.)  Furthermore, she asserts that during the last week of September 2001, she complained to Garrison that Irby was unfairly distributing the top sales accounts to male associates.  (See Perkins-Carrillo Dep. at 62, 189-92.)  Based on this evidence, the Court finds that the Plaintiff has created a triable issue of fact as to whether she engaged in statutorily protected activity recognized by Title VII.

It is undisputed that the Plaintiff suffered an adverse employment action when Global terminated her employment on January 29, 2002.  Global argues, however, that the Plaintiff cannot establish a causal connection between her termination and the

complaints she made to Garrison in late September 2001.  "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."  Bass v. Board of County Comm'rs, 256 F.3d 1095, 1119 (11th Cir. 2001) (quoting Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000)). Temporal proximity between awareness of the protected activity and the adverse employment action may suffice to show a causal link.  Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).  Nevertheless, Global argues that the four-month delay between the alleged statutorily protected activity and the Plaintiff's termination is not sufficient temporal proximity to establish causation.  Indeed, the Supreme Court has stated that the "temporal proximity" required to show a causal connection must be "very close."  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  In setting forth this limitation, the Supreme Court cited with approval cases in which three- and four-month delays were found to be insufficient to show a causal connection.  Id. (citing Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir. 1997) (three months); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four months)).  Similarly, the Eleventh Circuit has held that a lapse of three months between the protected activity and the adverse action, in the absence of other evidence tending to show causation, did not allow for a reasonable inference of a causal

relation.  <u>Allen v. United States Postmaster Gen'l</u>, 158 Fed. Appx. 240, 244 (11th Cir.

2005); <u>Higdon</u>, 393 F.3d at 1221.  Accordingly, the Court finds that the four-month

period between the two events here is not sufficiently close to warrant finding the

necessary causal connection.

The Plaintiff argues, however, that a causal link exists because, in addition to

the temporal proximity, there is evidence that a pattern of retaliatory activity began

after her complaint to Garrison in late September 2001.  Specifically, the Plaintiff

contends that: (1) all of her domestic accounts were removed; (2) she was treated less

favorably than similarly situated employees; (3) she was reprimanded in January 2002

for missing her sales quota; (4) she was "threatened" by Peters that Irby intended to

"retaliate" against her for complaining about discrimination;[12] (5) she learned from a

colleague that Irby intended to retaliate against her; (6) she was subjected to a

frightening and false phone call about a family emergency while at the Indoff

headquarters; (7) she was subjected to physical intimidation of being searched;[13] and

(8) she was ultimately terminated.  Except for her conclusory allegations, the Plaintiff

---

[12]Jimmy Peters denies ever telling the Plaintiff that he was concerned that Irby would retaliate against her for complaining about discrimination to Garrison.  (Peters Dep. at 22.)

[13]The alleged physically intimidating search of her belongings did not occur until *after* the Plaintiff had been fired.

has failed to point to any evidence in the record to support such alleged harassment. The Plaintiff does not present any evidence that she was treated less favorably than similarly situated employees or that she was treated differently from any other Global employees who missed their sales quotas for the month. Furthermore, the undisputed evidence shows that Garrison had contemplated removing the Plaintiff's domestic accounts for some time prior to the Plaintiff's complaints. "When an employer makes a tentative decision *before* protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation." Saffold v. Special Counsel, Inc., 147 Fed. Appx. 949, 951 (11th Cir. 2005) (citing Clark County Sch. Dist., 532 U.S. at 272 (where an employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed along the lines previously contemplated, though not yet definitively determined, did not establish evidence of causation)). Finally, the Plaintiff's allegations regarding Irby's threats of retaliation are nothing more than unsubstantiated hearsay. Absent sufficient evidence tending to show causation, and because the four-month period does not constitute "very close" temporal proximity, the Plaintiff has failed to establish a *prima facie* case of retaliation. See Higdon, 393 F.3d at 1220 ("If there is a substantial delay between the protected expression and the

adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

However, even assuming the Plaintiff could establish a causal connection between a statutorily protected activity and her termination and, thus, make out a *prima facie* case, she has not presented sufficient evidence to establish, or even create an issue of fact, that she was fired in retaliation for complaining about sex discrimination rather than for a legitimate, nondiscriminatory reason. The Court's pretext discussion in relation to the Plaintiff's sex discrimination claim applies with equal force to this claim. In sum, Global has shown that it had a good faith belief that the Plaintiff was employed by a competitor while still employed by Global, in violation of the non-compete agreement, and the Plaintiff has failed to present evidence to demonstrate that Global's articulated reason for her termination was pretext for retaliation. Accordingly, Global is entitled to summary judgment on the Plaintiff's Title VII retaliation claim.

C.   Retaliatory Compensation Policy and Hostile Work Environment

In her response brief, the Plaintiff alleges, for the first time, that: (1) Global imposed a discriminatory and retaliatory compensation policy;[14] and (2) Global created a retaliatory hostile work environment for the Plaintiff. Neither claim was asserted in the Plaintiff's Complaint or Amended Complaint. As the Eleventh Circuit has explained, plaintiffs are not permitted to raise new claims at the summary judgment stage:

> In Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002), the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. Indeed, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Efficiency and judicial economy require that the liberal pleading standards under Swierkiewicz and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.

Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) (citations omitted); see also McShane v. U.S. Attorney General, 144 Fed. Appx. 779, 788-89 (11th Cir. 2005) (plaintiff's amended complaint did not assert retaliation claim

---

[14]It is unclear whether the Plaintiff's assertions in this regard are meant to represent a distinct claim or merely add support to her argument that the removal of her domestic accounts was part of a continuing violation. As such, the Court has addressed the allegations under both alternatives.

under Title VII's participation clause and, thus, she could not raise it at summary judgment stage); Cooley v. Great S. Wood Preserving, 138 Fed. Appx. 149, 153-54 (11th Cir. 2005) (district court properly dismissed plaintiffs' hostile work environment claim that was raised for the first time in their brief opposing summary judgment). The Plaintiff did not seek leave to amend her Complaint to add a claim for discriminatory and retaliatory compensation policy or a discriminatory or retaliatory hostile work environment claim. As such, these claims, to the extent the Plaintiff attempts to raise them here, are properly dismissed.

Even if the Plaintiff's Amended Complaint could be construed as asserting these additional claims, the claims should be dismissed because they exceed the scope of the Plaintiff's EEOC charge. As a result of the administrative exhaustion requirement applicable to Title VII cases, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory, 355 F.3d at 1280 (quoting Alexander v. Fulton County, Ga., 207 F.3d 1303, 1332 (11th Cir. 2000)); see also Wu v. Thomas, 863 F.2d 1543, 1548 (11th Cir. 1989) ("The purpose of the filing requirement is to insure that the settlement of grievances be first attempted through the office of the EEOC."). Thus, "[t]he starting point for determining the permissible scope of a

judicial complaint is the administrative charge and investigation." Alexander, 207 F.3d at 1332 (quoting Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir. 1985)).

The Plaintiff's EEOC charge alleges that the Defendants assigned accounts in a discriminatory manner on the basis of gender. (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. 13; see also id., Ex. 14.) It further alleges discriminatory discharge and that the Plaintiff was retaliated against for reporting gender discrimination. (Id.) The Plaintiff specified the relevant dates of discrimination as January 29, 2002, through February 10, 2002. (Id., Ex. 13.) These dates coincide with the date the Plaintiff was terminated and the date she received her termination papers, respectively. The determination letter issued by the EEOC following its investigation states that "[e]xamination of the information from you during the Intake processing of your charge, along with the interview conducted by our Investigator, reveals that you were discharged for violation of company policy and the non-compete agreement." (Perkins-Carrillo Dep., Ex. 19.) It further states that "[i]n regards to retaliation, your complaint of retaliation does not fall under any of the laws administered by our agency. Also, your comparator is female, the same sex as you. Therefore the Commission finds no discrimination under Title VII." (Id.) Global argues that the new claims of discriminatory and retaliatory compensation and hostile work

environment would not "reasonably be expected to grow out of the charge of discrimination."

The sole allegations the Plaintiff raised in her EEOC charge relate to the discriminatory assignment of accounts and discriminatory and retaliatory discharge. There are substantial and material differences between the claims raised with the EEOC and claims of discriminatory compensation and hostile work environment. As such, it cannot be concluded that an investigation into the asserted allegations would have reasonably uncovered any evidence in support of the new claims. In addition, as evidenced by the determination letter, it does not appear that the EEOC received notice of or investigated any alleged unlawful compensation policy or sexually hostile work environment.[15] The Plaintiff points to no evidence to the contrary. Because they are not reasonably related to the allegations presented at the administrative level, the claims of discriminatory and retaliatory compensation and hostile work environment exceed the scope of the EEOC complaint and investigation. Accordingly, the Plaintiff

---

[15]On her EEOC Charge Questionnaire, the Plaintiff indicated that she felt her termination was discriminatory because, among other things, "Rod Irby made a hostile working environment." (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. 14.) This statement is insufficient to put the EEOC on notice of a legally cognizable hostile work environment claim. She alleges only that the environment was hostile as a result of the distribution of accounts. Moreover, she fails to allege any offensive or harassing conduct that would support a claim for a sexually hostile work environment or even indicate the need to investigate such a claim.

has failed to satisfy the exhaustion requirement with regard to these claims, and summary judgment is warranted.

   D.   <u>Federal and State Wiretapping Claims</u>

   Title III of the Omnibus Crime Control and Safe Streets Act of 1968, commonly referred to as the Electronic Communications Privacy Act, provides, in pertinent part:

> Except as otherwise specifically provided in this chapter any person who -- (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; . . . shall be punished as provided in subsection (4) [fined or imprisoned not more than five years, or both] or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1)(a). Although Section 2511 itself addresses criminal liability, 18 U.S.C. § 2520 provides for the recovery of civil damages for violations of Section 2511. Specifically, Section 2520 states:

> [A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a). The Plaintiff alleges that Global, Garrison, and Irby violated this section "by tape recording and monitoring plaintiff's telephone calls for a purpose for which plaintiff did not give consent." (Am. Compl. ¶¶ 51, 63.) The Plaintiff amended her Complaint to assert her wiretapping claims following the depositions of Garrison and Irby. During his deposition, Garrison testified that after hearing rumors that the

Plaintiff was working for a competitor while still employed at Global, a few attempts were made to monitor the Plaintiff's telephone calls in an effort to confirm or deny the rumors. Because the Plaintiff often spoke Spanish during her calls, Garrison testified that he directed Herb Maldonado, a Spanish-speaking data processing employee, to monitor the calls. (Garrison Dep. at 183.) Similarly, Irby testified that Garrison instructed Maldonado to listen to the Plaintiff's telephone calls for the purpose of determining whether the Plaintiff was in fact working for another company. (Irby Dep. at 82-83.) Nevertheless, Maldonado testified unequivocally that he never listened to any recorded telephone calls nor was he ever asked to do so by Garrison or Irby. (Maldonado Dep. at 8.)

Even assuming that Garrison instructed Maldonado to monitor the Plaintiff's telephone calls and that Irby was aware of that fact, the Plaintiff cannot establish that Garrison and Irby violated Section 2520. Although Section 2511(1)(a) provides that "procur[ing] any other person to intercept or endeavor to intercept" is a crime, Section 2520(a) does not authorize a civil cause of action for "procurement." Rather, civil liability may be imposed only against "the person or entity *which engaged in that violation*," with "violation" being limited to "intercepted, disclosed, or intentionally used." 18 U.S.C. § 2520(a) (emphasis added); see Peavy v. WFAA-TV, Inc., 221 F.3d 158, 168-69 (5th Cir. 2000) (Section 2520's plain and unambiguous language

does not provide for a civil action against those that merely procure interception by another).  It is undisputed that neither Garrison nor Irby monitored any of the Plaintiff's calls.  Consequently, the Plaintiff's claim against these individuals fails as a matter of law.

Additionally, the Defendants argue that the wiretapping claims fail because the Plaintiff consented to having telephone calls monitored by Global.  Title III contains a number of exceptions, including a consent exception set forth in Section 2511(2)(d).  Under the consent exception, there is no violation of Title III where "one of the parties to the communication has given prior consent to such interception," unless the interception is for a criminal or tortious purpose.  18 U.S.C. § 2511(2)(d).  The Georgia wiretapping statute contains a similar exception, providing that interception of a wire, oral, or electronic communication is not prohibited if "one of the parties to the communication has given prior consent to such interception."  O.C.G.A. § 16-11-66(a).  Because the consent exception is to be "construed broadly," consent may be express or implied.  Griggs-Ryan v. Smith, 904 F.2d 112, 116 (1st Cir. 1990); United States v. Amen, 831 F.2d 373, 378 (2d Cir. 1987).  But see Watkins v. L.M. Berry & Co., 704 F.2d 577, 581 (11th Cir. 1983) ("Consent under title III is not to be cavalierly implied.  Title III expresses a strong purpose to protect individual privacy by strictly limiting the occasions on which interception may lawfully take place.").  Moreover,

unlike the "business extension" exception, which limits the scope of the exemption to those calls monitored in the "ordinary course of business," "[c]onsent may be obtained for any interceptions, and the business or personal nature of the call is entirely irrelevant." Watkins, 704 F.2d at 581.

In 1997, the Plaintiff signed Global's "Electronic Communications Policy." The policy provides that the company's electronic communications systems are for business use only and may not be used for personal matters unrelated to the business of Global. (Def. Global's Mot. for Summ. J., Ex. N.) Under the policy, Global is expressly permitted to:

> [A]ccess its electronic communications systems and obtain the communications within the systems, without notice to users of the system, in the ordinary course of business when the Company deems it appropriate to do so. The reasons for which the Company may obtain such access include, but are not limited to: maintaining the system; preventing or investigating allegations of system abuse or misuse; . . .

(Id.) The Plaintiff concedes that this policy "allowed unlimited monitoring of her phone calls." (Pl.'s Resp. to Defs.' Mots. for Summ. J. at 53.) She contends, however, that the 1997 unlimited monitoring policy was superseded in 1999 by one that allowed monitoring on a more limited basis. According to the Plaintiff, she consented to calls being monitored only for the purpose of improving customer service. The Plaintiff argues that it is permissible to limit the scope of consent to monitoring and that Global exceeded the scope of her consent because she

occasionally made personal telephone calls during the period in which her calls were allegedly being monitored.  See Watkins, 704 F.2d at 581 (employer exceeded scope of consent where employee did not consent to policy of general monitoring but limited her consent instead to the monitoring of sales calls and not personal calls).  This argument is without merit for several reasons.  First, the Plaintiff has not identified any specific telephone calls, personal or otherwise, that were monitored or recorded by Global.  Indeed, the Plaintiff admits that "there is no evidence that anyone at Global ever monitored plaintiff's telephone calls during this period."  (Pl.'s Resp. to Defs.' Mots. for Summ. J. at 38.)  Furthermore, even if she could point to personal calls that were recorded, the Plaintiff has failed to demonstrate that the 1997 policy permitting unlimited monitoring was ever limited.  While correct that the Plaintiff signed an "Acknowledgment and Agreement" form in September of 1999 that referenced Global's ability to monitor and record telephone calls, the form does not indicate that Global intended to limit or amend its previously stated policy permitting unlimited monitoring.  Rather, the document signed by the Plaintiff was merely an acknowledgment of receipt of Global's personnel policies, including the aforementioned Electronic Communications Policy.  Moreover, the document reiterated that "a third party may be involved in a call without [the employee's] knowledge."  (Def. Global's Mot. for Summ. J., Ex. M.)  Nothing in this language

suggests a constriction of Global's telephone monitoring policy.  Because the Plaintiff consented to Global monitoring her telephone calls, the Defendants are entitled to summary judgment on both the federal and state wiretapping claims.

     E.     <u>Conspiracy–42 U.S.C. § 1985(3)</u>

The Plaintiff alleges that Garrison and Irby conspired because of her sex to deny her equal protection under the law by giving false testimony during the course of this lawsuit, in violation of 42 U.S.C. § 1985(3).  To establish a claim under Section 1985(3), a plaintiff must prove: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States.  <u>United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott</u>, 463 U.S. 825, 828-29 (1983); <u>Park v. City of Atlanta</u>, 120 F.3d 1157, 1161 (11th Cir. 1997).  Section 1985(3) is not meant to serve as a general federal tort law.  <u>Trawinski v. United Techs.</u>, 313 F.3d 1295, 1299 (11th Cir. 2002).  Thus, in order to establish the second element, a plaintiff must show that there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators'

action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Lucero v. Operation Rescue of Birmingham, 954 F.2d 624, 628 (11th Cir. 1992).

As a threshold matter, the Plaintiff must show that an agreement existed between the members of the alleged conspiracy. Her conspiracy claim arises solely out of a conflict between the testimony of Garrison and Irby and that of Herb Maldonado. Specifically, as discussed above, Garrison and Irby testified that Maldonado monitored some of the Plaintiff's calls. (Garrison Dep. at 184; Irby Dep. at 82.) In contrast, Maldonado testified that he was not asked to listen to any recorded telephone calls and did not do so. (Maldonado Dep. at 8.) However, subsequent to his deposition, Garrison submitted an affidavit explaining his mistaken testimony and clarifying that while he intended to have Maldonado monitor the Plaintiff's business calls, and expressed this intention to Irby, he must not have actually told Maldonado to monitor the calls. (Garrison Aff. ¶¶ 4-8.) It is based on this inconsistency in the testimony of the three individuals that the Plaintiff asserts her conspiracy claim. However, even setting aside Garrison's explanation for the apparent conflict in testimony, the Plaintiff has not shown that Garrison and Irby conspired to give false testimony. Although circumstantial evidence may be sufficient to establish the existence of a conspiracy, see Burrell v. Board of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992), there must be at least some indication that the alleged

conspirators were acting in concert to violate the Plaintiff's constitutional rights.  The only evidence pointed to by the Plaintiff in support of her claim that a conspiracy existed is that Garrison and Irby made a number of joint decisions while at Global and that the two were business partners at the time they were deposed.  These facts are wholly insufficient to infer, let alone establish, the existence of a conspiracy.  Absent any indication of a conspiracy beyond the Plaintiff's unsupported and conclusory allegations, the Section 1985(3) claim fails as a matter of law.  See Kearson v. Southern Bell Tel. & Tel. Co., 763 F.2d 405, 407 (11th Cir. 1985) ("In civil rights and conspiracy actions, conclusory, vague, and general allegations of conspiracy may justify dismissal of a complaint.").

Additionally, it is unclear whether gender-based discrimination is actionable under Section 1985(3).  In Lucero, the Eleventh Circuit reserved judgment on the issue.  Lucero, 954 F.2d at 629 n.6 (citing Faucher v. Rodziewicz, 891 F.2d 864, 871 n.4 (11th Cir. 1990)) (noting that the circuits are split on the question).  The issue was revisited in Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332 (11th Cir. 1999).  In Lyes, the Eleventh Circuit held that Section 1985(3) protects women as a class of persons.[16]  However, the court limited its holding to situations where the conspirators

---

[16]The seven circuits that have directly addressed the issue have all held that Section 1985(3) applies to conspiracies motivated by gender-based animus against women.  Lyes, 166 F.3d at 1338-39 (citing Libertad v. Welch, 53 F.3d 428, 448-49

were acting under color of state law and explicitly declined to decide whether Section 1985(3) proscribes private actor conspiracies against women. Id. at 1336-37, 1339-40. This Court need not resolve the question left unanswered in Lyes because, even assuming that conduct of private actors motivated by a gender-based animus can violate Section 1985(3), the Plaintiff has not presented any evidence that Garrison and Irby were in fact motivated to testify falsely because of such a discriminatory animus. The Eleventh Circuit has emphasized that because the discriminatory intent requirement is a "significant hurdle," "Section 1985(3) actions often stand or fall on the plaintiff's ability to establish the specific type of discriminatory animus behind the conspirators' actions." Burrell, 970 F.2d at 794. The Plaintiff claims that her Title

_____

(1st Cir. 1995); National Org. for Women v. Operation Rescue, 914 F.2d 582 (4th Cir. 1990), rev'd in part and vacated in parts on other grounds, Bray v. Alexandria Women's Health Clinic, 506 U.S. 263 (1993); New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1359 (2d Cir. 1989); Volk v. Coler, 845 F.2d 1422, 1434 (7th Cir. 1988); Life Ins. Co. of N. Am. v. Reichardt, 591 F.2d 499, 505 (9th Cir. 1979); Novotny v. Great Am. Fed. Sav. & Loan Ass'n, 584 F.2d 1235, 1243 (3d Cir. 1978), vacated on other grounds, 442 U.S. 366 (1979); Conroy v. Conroy, 575 F.2d 175, 177 (8th Cir. 1978)). But see Deubert v. Gulf Fed. Sav. Bank, 820 F.2d 754, 757 (5th Cir. 1987) (stating in dicta that only conspiracies motivated by racial animus are actionable under Section 1985(3)); Wilhelm v. Continental Title Co., 720 F.2d 1173, 1176 (10th Cir. 1983). The Supreme Court, however, has not yet been presented with a case in which it was necessary to resolve the issue of whether women are a qualifying class under Section 1985(3). See Bray v. Alexandria Women's Health Clinic, Inc., 506 U.S. 263, 269 (1993); see also Griffin, 403 U.S. at 102 n.9 ("We need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us.").

VII allegations of workplace discrimination and retaliation based on her gender are enough to establish the requisite animus. This evidence does not clear the "significant hurdle" associated with the intent element of a Section 1985(3) claim. Simply alleging a general discriminatory animus is insufficient to show that such animus was the motivating factor behind the alleged conspiracy to deprive the Plaintiff of her constitutional rights by testifying falsely. Summary judgment is thus warranted.

      F.     <u>Intentional Infliction of Emotional Distress</u>

The Plaintiff alleges that Global intentionally inflicted emotional distress upon her in violation of Georgia law. To prevail on an intentional infliction of emotional distress claim under Georgia law, a plaintiff must prove the following: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. <u>Jarrard v. United Parcel Serv., Inc.</u>, 242 Ga. App. 58, 59 (2000). Global argues that the Plaintiff has not shown conduct that is sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress. Whether the conduct rises to the requisite level of outrageousness is a question of law for the trial court. <u>Ashman v. Marshall's of MA, Inc.</u>, 244 Ga. App. 228, 229 (2000).

The plaintiff's burden of establishing that conduct is extreme and outrageous is a stringent one. <u>Bridges v. Winn-Dixie Atlanta, Inc.</u>, 176 Ga. App. 227, 229 (1985).

In order to justify a finding of outrageousness, the conduct must be so extreme in degree and outrageous in character as to surpass all bounds of decency and be regarded as atrocious and intolerable in civilized society.  Jarrard, 242 Ga. App. at 59 (quoting Biven Software, Inc. v. Newman, 222 Ga. App. 112, 114 (1996)); see Ashman, 244 Ga. App. at 229 ("The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim 'Outrageous!'").  It must be of such a terrifying or insulting nature that it would naturally give rise to such intense feelings of humiliation, embarrassment, or fright to the point of causing severe emotional distress. Peoples v. Guthrie, 199 Ga. App. 119, 121 (1991).  Mere insults, indignities, threats, annoyances, petty oppressions, or the fact that the plaintiff was offended or insulted will not support an allegation of extreme and outrageous conduct.  Hodor v. GTE Mobilnet, Inc., 244 Ga. App. 297, 299 (2000); see Peoples, 199 Ga. App. at 121 ("There is no occasion for the law to intervene in every case where someone's feelings are hurt.").

The Plaintiff claims that Global's conduct was extreme and outrageous because her accounts were taken away, she was threatened with punishment for complaining about discrimination, and she received a phone call during her interview with Indoff

under the guise of a family emergency but was then hung up on.  Because this conduct occurred in the workplace, the Plaintiff contends that the existence of an employer-employee relationship produced a character of outrageousness that might not exist in other circumstances.  See Trimble v. Circuit City Stores, Inc., 220 Ga. App. 498, 499 (1996) ("The existence of a special relationship between the actor and victim, such as that of employer to employee, may make otherwise non-egregious conduct outrageous.").  Even considering the employment setting, however, Global's conduct does not elicit the major outrage that is essential to an intentional infliction of emotional distress claim.  See Ashman, 244 Ga. App. at 229-30.  First, it is well established under Georgia law that termination of employment, even if done for an improper or retaliatory reason, does not constitute extreme or outrageous conduct. See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993) ("Georgia courts have held that an employer's termination of an employee--however stressful to the employee–generally is not extreme and outrageous conduct."); Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992) ("Even if the employee is not terminable at will, discharge for an improper reason does not constitute the egregious kind of conduct on which a claim of intentional infliction of emotional distress can be based."); ITT Rayonier, Inc. v. McLaney, 204 Ga. App. 762, 764 (1992) ("Since, under applicable provisions of state tort law, at-will employment can

be terminated for any or no reason, that ITT determined to demote or discharge appellee for whatever reason, without more, gives rise to no claim for the intentional infliction of emotional distress.") (internal punctuation and citations omitted).  Thus, it is equally apparent that less severe actions such as alterations in work assignments and responsibilities or mere threats of discharge are not extreme and outrageous.  See Mundy v. Southern Bell Tel. & Tel. Co., 676 F.2d 503, 504-06 (11th Cir. 1982) (threats by supervisor to destroy employee's career, transfers to less desirable jobs, negative and unfair evaluations, and attempts to damage employee's credibility were not extreme and outrageous); Wilson v. Georgia-Pacific Corp., 4 F. Supp. 2d 1164, 1168 (N.D. Ga. 1998) ("In Georgia, disadvantageous employment actions standing alone cannot serve as the basis for the tort of intentional infliction of emotional distress.").  Additionally, although allowing the Plaintiff to think that there was a family emergency and then hanging up the phone may have been insensitive and in poor taste, such conduct is not of such a terrifying or insulting nature that it rises to the level of outrageousness necessary to sustain a claim for intentional infliction of emotional distress.

However, even assuming Global's actions were extreme and outrageous, the Plaintiff has failed to demonstrate that any resulting emotional distress was severe.  Severe emotional distress is that which is "so severe that no reasonable man could be

expected to endure it." Witter v. Delta Airlines, Inc., 966 F. Supp. 1193, 1201 (N.D. Ga. 1997) (citation omitted); Bridges, 176 Ga. App. at 230 (citation omitted); see also Quarles v. McDuffie County, 949 F. Supp. 846, 855 (S.D. Ga. 1996) (emotional distress must be "highly unpleasant"). Here, the Plaintiff contends that she suffered from insomnia, intermittent spells of crying, occasional headaches, some digestive problems, anxiety, and a tightening feeling in her chest. (Perkins-Carrillo Dep. at 357-60.) The Court finds that these symptoms are not of the type that no reasonable man could be expected to endure. See Witter, 966 F. Supp. at 1201 (anxiety, sleeplessness, overeating, diarrhea, and headaches did not evidence severe emotional distress). In fact, it is undisputed that the Plaintiff neither sought the help of a mental health professional or a physician nor did she take any medication during her employment with or after her termination from Global. See Quarles, 949 F. Supp. at 855-56 (no evidence of severe emotional distress where plaintiff did not seek the help of a physician or counselor and resumed work shortly after the alleged outrageous conduct). Absent any evidence of severe emotional distress beyond the Plaintiff's conclusory assertion, the Plaintiff's claim for intentional infliction of emotional distress fails. Summary judgment for Global is warranted.

## IV.  CONCLUSION

For the reasons set forth above, Defendant Systemax, Inc., d/b/a Global Equipment, Inc.'s Motion for Summary Judgment [Doc. 75] is GRANTED; and Defendants Greg Garrison and Rodney Irby's Motion for Summary Judgment [Doc. 76] is GRANTED.

SO ORDERED, this 26 day of May, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge